UNITED STATES of America, Appellee,

v.

Scot SPENCER, Defendant–Appellant.

No. 1031, Docket 96–1460.

United States Court of Appeals,
Second Circuit.

Argued March 5, 1997.

Decided Oct. 30, 1997.

Judd Burstein, Burstein & Fass LLP, New York City, for Defendant–Appellant.

Eric Corngold, Assistant United States Attorney, Brooklyn, NY (Emily Berger, Jason Brown, Assistant United States Attorneys, Zachary W. Carter, United States Attorney for the Eastern District of New York, Brooklyn, NY, of counsel), for Appellee.

Before: WALKER, McLAUGHLIN and WOOD,* Circuit Judges.

WALKER, Circuit Judge:

Defendant-appellant Scot Spencer appeals from a judgment of conviction following a jury trial in the United States District Court for the Eastern District of New York (Reena Raggi, *District Judge*). The jury found Spencer guilty of bankruptcy fraud in violation of 18 U.S.C. § 152 and conspiracy to commit bankruptcy fraud in violation of 18 U.S.C. § 371. On May 23, 1996, Spencer was sentenced in principal part to a term of fifty-one months of imprisonment and three years of supervised release.

On appeal, Spencer argues that his conviction for bankruptcy fraud was based on legally insufficient evidence; that his conviction for conspiracy to commit bankruptcy fraud cannot stand because the government failed to prove the existence of a coconspirator; and that in various respects his sentence violated the United States Sentencing Guidelines.

We affirm.

## BACKGROUND

This case arises from Spencer's inability to disassociate himself from the most recent reincarnation of Braniff Airlines. The original Braniff Airlines ("Braniff I"), founded in the early days of commercial aviation, filed

* The Honorable Harlington Wood, Jr. of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

for bankruptcy in 1982. Subsequently, an investment group purchased Braniff's name and certain assets to form another airline, Braniff, Inc. ("Braniff II"). In 1988, a corporation controlled by Jeffrey Chodorow and Arthur Cohen purchased a controlling interest in Braniff II. In 1989, Braniff II ceased operations and filed for bankruptcy. In 1990, Chodorow and Cohen, seeking to restart Braniff Airlines, formed a holding company named BNAir, Inc. and purchased the Braniff name from the Braniff II bankruptcy estate. Spencer was named president of BNAir. However, BNAir could not offer commercial passenger service without obtaining a "certificate of public convenience and necessity" from the United States Department of Transportation ("DOT"). *See* 49 U.S.C. § 41102(a). The DOT requires that applicants for such a certificate pass a fitness test. *See* 49 U.S.C. § 41102(b)(1).

In a meeting between BNAir and DOT in January 1990, the DOT advised BNAir that it had significant objections to BNAir's proposed passenger service. In particular, DOT expressed its concern about Spencer's role with the company, citing his lengthy criminal history and poor performance record with Braniff II.

Faced with this obstacle, BNAir decided to obtain the necessary certificate by a different route. In late 1990, BNAir entered into a purchase agreement with Emerald Air, Inc., an airline in bankruptcy that already possessed the necessary certificate. As a result of the purchase agreement, BNAir and Emerald merged and named the resulting entity Braniff International Airlines, Inc. ("Braniff"). The DOT continued to raise questions about, among other things, Spencer's involvement in the resulting airline and the agency commenced a review of Emerald's continued fitness to possess a certificate.

In May 1991, DOT informed Braniff that Chodorow, Cohen and Spencer must submit sworn affidavits to the DOT attesting that Spencer would hold no position and have no involvement in Braniff. The DOT stated that it would refuse to certify the airline in the absence of the affidavits. On May 31, 1991, the requested affidavits were submitted. In his affidavit, Spencer stated that he would not hold any position or have any direct or indirect involvement in Emerald or any successor carrier. He promised not to make decisions on behalf of the carrier, commit the carrier in any way, direct any of its employees, or provide it with any consulting or advisory services. The DOT reissued Emerald's certificate to Braniff and Braniff commenced passenger service in July 1991.

This latest Braniff fared no better than its predecessors and in August 1991 filed a Chapter 11 bankruptcy petition. In September 1991, Chodorow became Braniff's President and Chief Executive Officer.

Despite the representations in the affidavits submitted to the DOT, Spencer remained heavily involved in the operations of Braniff both before and after it filed under Chapter 11. Although it was a point of dispute at trial, Spencer now concedes that he "acted openly and flagrantly on behalf of Braniff." Appellant Spencer's Br. at 7.

It was Spencer's effort to receive compensation surreptitiously for his services to Braniff that led to his convictions for bankruptcy fraud and conspiracy. Spencer's scheme was to launder Braniff's payments to him and thereby conceal them from the bankruptcy court and Braniff's creditors through an advertising agency owned by one Stephen Pliss. In January 1992, Pliss met with Spencer and Spencer's father to discuss placing the airline's advertising in various newspapers. According to Pliss, the usual industry practice prior to 1980 was for advertising agencies to bill their clients for the full amount of an advertisement but receive a 15% discount from the newspaper which the agency would keep as a commission. After 1980, however, fewer clients permitted agencies to keep the full 15% as a commission and it was customary for advertisers to negotiate a lower rate with agencies. According to Pliss, when he negotiated with Spencer, he initially asked Spencer for a 7.5% commission, but ultimately accepted 4%.

After agreeing upon the 4% commission, Spencer asked Pliss, and Pliss agreed, not to return directly to Braniff the 11% balance of the 15% commission, but instead to disburse 10% to Spencer and 1% to Spencer's father.

Spencer received payments from Pliss in this manner from January to April 1992. During this period, Spencer played a significant role in directing Braniff's advertising budget, other payments from Braniff to Pliss, and the overall operations of Braniff. As a company operating under the protection of Chapter 11, Braniff was required to submit reports accounting for its expenditures to the bankruptcy court and its creditors. None of these reports reflected the payments made to Spencer. Pliss testified that he believed the payments to Spencer were in fact refunds to Braniff.

Evidence at trial demonstrated further that on several occasions Braniff paid Pliss more than the total cost of the advertising placed by Pliss. On one occasion Pliss was overpaid by $72,554. Pliss passed these overpayments along to Spencer pursuant to Spencer's instructions. Spencer received a total of $351,411 from Pliss, most of it from the advertising discounts but also $97,500 from the "overpayments."

In March 1992, the Federal Aviation Administration ("FAA") and the DOT told Braniff that they were informed that Spencer was acting in a management capacity at the airline and that the FAA was considering whether to suspend the airline's authority to operate. In meetings with the FAA and DOT, Chodorow denied that Spencer was involved in any capacity with Braniff and submitted another affidavit swearing that Spencer had not been involved with Braniff since July 1, 1991. Braniff ceased doing business with Pliss in April 1992. On July 2, 1992, the airline ceased all operations and the court converted the bankruptcy proceeding to one under Chapter 7.

On July 19, 1994, Spencer and Chodorow were indicted. Count One of the indictment charged that the two men conspired to defraud the DOT by obstructing the DOT's role in the issuance and review of certificates issued to airlines in violation of 18 U.S.C. § 371. Count Two charged Chodorow and Spencer with obstructing a pending proceeding before the DOT in violation of 18 U.S.C. § 1505. Count Three charged that Chodorow and Spencer conspired to fraudulently conceal from creditors property belonging to

the bankruptcy estate of Braniff in violation of 18 U.S.C. § 371, and Count Four charged them with bankruptcy fraud in violation of 18 U.S.C. § 152.

Pursuant to a plea agreement, codefendant Chodorow pleaded guilty to Counts One and Two before trial. The jury acquitted Spencer on Counts One and Two, but found him guilty on Counts Three and Four.

## DISCUSSION

### I. *Legal Sufficiency of the Government's Theory*

■ Spencer argues that he is entitled to a new trial on the bankruptcy fraud issue because the jury was permitted to convict him on a prosecution theory that was legally insufficient. Spencer argues that the government's theory was that Spencer was a fiduciary who had a duty not to accept money from Pliss for obtaining Braniff's business. Spencer argues that there was no evidence that he owed Braniff a fiduciary duty, and that even if he did, his actions did not deprive Braniff of funds belonging to the airline. He contends that, at most, his scheme deprived Braniff of its right to Spencer's faithful and honest services. Spencer claims that the government had to rely on this fiduciary theory because Pliss had the right to receive and distribute the 15% commission as he saw fit. Thus, Spencer asserts, the government's case must rest on Spencer's purported status as a fiduciary who had a duty not to accept money from Pliss.

Spencer's argument mischaracterizes the government's theory and is beside the point. The government's case was not premised on a breach of a fiduciary duty by Spencer, but rather on the theory that Spencer committed bankruptcy fraud by hiding from the bankruptcy court and creditors the payment of Braniff funds to him through a sham transaction with Pliss. To the extent that Spencer's challenge is one of evidentiary insufficiency, it must be rejected.

■ In reviewing challenges to the sufficiency of the evidence at trial, "we must view the evidence in the light most favorable to the government and construe all possible in-

ferences in its favor. If any rational trier of fact could have found the essential elements of the crime, the conviction must stand." *United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986) (internal citations and quotation marks omitted). In addition, " 'pieces of evidence must be viewed not in isolation but in conjunction.' " *United States v. Brown*, 776 F.2d 397, 403 (2d Cir.1985) (*quoting United States v. Geaney*, 417 F.2d 1116, 1121 (2d Cir.1969)).

The evidence, taken in its entirety, easily demonstrated that the business relationship between Pliss and Spencer was a sham designed to unlawfully conceal from the bankruptcy court and Braniff's creditors Braniff's compensation to Spencer for services rendered. There was evidence that Spencer in fact directed Braniff's executives and made many key corporate decisions, including ordering Braniff's financial officer to transmit the payments to Pliss that resulted in Spencer's enrichment and that were never reflected as payments to Spencer on Braniff's books. There was also evidence that Braniff's advertising costs grew rapidly after Spencer developed a financial interest in Braniff's payments to Pliss and that Pliss transmitted overpayments directly to Spencer, who kept them instead of returning the funds to Braniff. Viewing the evidence in the light most favorable to the government, *see Badalamenti*, 794 F.2d at 828, the evidence was more than sufficient for the jury to conclude that Spencer and Pliss had devised a scheme to launder payments from Braniff through Pliss to Spencer. *See United States v. Martin*, 408 F.2d 949, 953–54 (7th Cir.1969) (holding that trier of fact could conclude payments to attorney and accountant that were transmitted to corporate officers as "kick backs" were part of sham transaction to deprive funds from creditors in any future bankruptcy proceedings).

## II. *Sufficiency of Evidence of Conspiracy*

Spencer argues that his conviction for conspiracy to commit bankruptcy fraud must be reversed because no rational jury could conclude that he conspired with anyone. Spencer contends that there was insufficient evidence to support a finding that either Chodorow or Pliss conspired with him to commit bankruptcy fraud. We disagree.

Spencer argues that there was an absence of evidence that Pliss was aware of the scheme to defraud Braniff and its creditors or that Pliss even knew that Spencer was keeping the payments from Braniff. Spencer maintains that the government improperly proved the conspiracy by asking the jury first to disbelieve Pliss's testimony that Pliss thought his payments to Spencer were going back to Braniff and then to rely on that disbelief as evidence that Pliss and Spencer were coconspirators. Spencer correctly cites *Dyer v. MacDougall*, 201 F.2d 265, 268–69 (2d Cir.1952) (Hand, L., J.), for the rule that "while a jury may be permitted to draw negative inferences from disbelieved testimony, a case cannot go to a jury solely on that basis." *United States v. Eisen*, 974 F.2d 246, 262 & n. 6 (2d Cir.1992) (discussing *Dyer* ). However, the rule in *Dyer v. MacDougall* is inapplicable if independent evidence supports the government's case. *See Eisen*, 974 F.2d at 262.

In this case, the government presented independent evidence of Pliss's knowing participation in the unlawful scheme in the form of an incriminating paper trail. Pliss identified various checks he made out to Spencer and Spencer's father and, on cross examination by Spencer's own attorney, noted that many of the checks returned to him after being cashed were endorsed by Spencer and contained no indication that any funds went to Braniff. Moreover, bills sent by Pliss to Braniff did not reflect any "rebate" of 11% to Braniff nor any payments to Spencer. In addition, Pliss transmitted the overpayments to Spencer, not to Braniff. In sum, there was ample evidence for the jury to find beyond a reasonable doubt that Pliss was a coconspirator in Spencer's scheme.

There was sufficient evidence to support a jury finding that Chodorow was a member of the conspiracy as well. Braniff's Vice President of Finance testified that Chodorow instructed him to follow Spencer's directions to make payments to Pliss. Pliss testified that Spencer rejected his request for a higher commission because Chodorow "would never go for [it]." There was sub-

stantial evidence that Chodorow knew of and approved of Spencer's role in making key decisions for Braniff even though Braniff's financial records were silent as to payments to Spencer. Viewing the evidence in the light most favorable to the government, *see Badalamenti,* 794 F.2d at 828, a jury could infer that Chodorow was a participant in the conspiracy.

## III. *Sentencing Issues*

Spencer also attacks the calculation of his sentence under the United States Sentencing Guidelines. The district court determined that Spencer had a total offense level of 23: a base offense level of 6 under U.S. Sentencing Guidelines Manual § 2F1.1(a) for committing a crime of fraud and deceit; a two-level enhancement under § 2F1.1(b)(3)(B) for violating an administrative order or process; a four-level enhancement under § 3B1.1(a) for his role as an organizer or leader of criminal activity that was "otherwise extensive"; a nine-level enhancement under § 2F1.1(b)(1)(J) for committing an offense causing a loss of more than $350,000; and a two-level enhancement under § 2F1.1(b)(2)(A) for committing an offense involving more than minimal planning. Based upon the total offense level of 23 and Spencer's category two criminal history, the district court sentenced Spencer to the minimum of 51 months permitted by the Guidelines.

■ Spencer argues that the district court erred in increasing his offense level (1) for violating an administrative order or process, (2) for his role as an organizer or leader of criminal activity that was "otherwise extensive," (3) for committing an offense causing a loss of more than $350,000, and (4) for committing an offense involving more than minimal planning. We review the district court's interpretation and application of the Sentencing Guidelines *de novo. See United States v. Zagari,* 111 F.3d 307, 323 (2d Cir.1997).

### A. *Violation of Administrative Order or Decree*

■ The district court did not err in applying the enhancement for Spencer's violation of an administrative order or process.

U.S.S.G. § 2F1.1(b)(3)(B) allows an increase in the offense level for "violation of any judicial or administrative order, injunction, decree or process." The Background note states that a "defendant who has been subject to civil or administrative proceedings for the same or similar fraudulent conduct demonstrates aggravated criminal intent and is deserving of additional punishment for not conforming with the requirements of judicial process or orders issued by federal ... administrative agencies."

Spencer argues that the activity of DOT did not result in any administrative order, injunction, decree, or process and thus the proscription of U.S.S.G. § 2F1.1(b)(3)(B) was not violated. We disagree. While there was no formal adversary "proceeding" before the DOT resulting in a formal administrative "order" or "decree," there was an extensive negotiation with DOT, culminating in an agreement, evidenced by the affidavits, that was violated by Spencer. In short, there was an informal administrative "process" of negotiation and an informal "decree" that if the affidavits were not submitted and the promises therein not kept, the DOT would revoke the airline's operating certificate. The propriety of the district court's enhancement on this ground is further supported by the guideline's background commentary: whether Spencer chose to submit to and violate a formal DOT process, or whether he deliberately avoided such process by giving solemn promises to DOT which he later violated, we believe that Spencer demonstrated the same "aggravated criminal intent" underlying § 2F1.1(b)(3)(B).

*United States v. Linville,* 10 F.3d 630 (9th Cir.1993), relied upon by Spencer, is inapposite. *Linville* found that disregard for "relatively informal missives and official notifications and warnings of violations" does not evidence the "aggravated criminal intent" underlying the § 2F1.1(b)(3)(B) sentence enhancement. *Id.* at 633. In this case, however, DOT went to considerable lengths to prevent Spencer from participating in Braniff. DOT engaged in extensive negotiations with BNAir, demanding and ultimately obtaining the Spencer and Chodorow affidavits as a condition of allowing the airline to operate.

Spencer's conduct in the face of DOT's actions was sufficiently aggravated to warrant the enhancement.

Because we hold that Spencer's violation of the DOT process in this case satisfies § 2F1.1(b)(3)(B), we need not address the difficult issue of whether Spencer's violation of bankruptcy orders also suffices to support an increase under the same provision.

### B. Criminal Activity that was "Otherwise Extensive"

■ Spencer's offense level was increased by four levels pursuant to U.S.S.G. § 3B1.1(a) because he was "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Application Note 1 to § 3B1.1 defines "participant" as "a person who is criminally responsible for the commission of the offense." Because the government does not argue that five criminally responsible participants were involved, the application of § 3B1.1(a) must rest on the "otherwise extensive" requirement. Application Note 3 to § 3B1.1 states that "[i]n assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive."

We recently addressed the proper method for determining whether a criminal activity is "otherwise extensive" in *United States v. Carrozzella*, 105 F.3d 796 (2d Cir.1997), where we pointed out that application of § 3B1.1(a) "is based primarily on the number of people involved, criminally and noncriminally, rather than on other possible indices of the extensiveness of the activity," *id.* at 802, and noted that "otherwise extensive" is the "functional equivalent of [a crime] involving five or more knowing participants," *id.* at 803. We held that the sentencing court in making the "otherwise extensive" assessment should determine:

(i) the number of knowing participants;

(ii) the number of unknowing participants whose activities were organized or led by the defendant with specific criminal intent;

(iii) the extent to which the services of the unknowing participants were peculiar and necessary to the criminal scheme.

*Id.* at 803–04. Ultimately, we remanded the case for further findings because the district court erred in emphasizing the number of clients defrauded and the sophistication of the scheme, and because the roles of various employees involved in the scheme were "obscure." *Id.* at 805.

In this case, Judge Raggi properly limited her inquiry to the persons involved in Spencer's scheme. No useful purpose would be served in remanding the case and requiring Judge Raggi simply to recast her findings in the more explicit terms described by our subsequent decision in *Carrozzella*.

Spencer contends that his activity was not "otherwise extensive" because the airline would have run exactly the same way, with the exception of the payments to Pliss, if Spencer were not involved. Rejecting this argument, Judge Raggi found that:

What was going on here [was] that Scott [sic] Spencer was determined to run Braniff. . . . [H]e was going to run it no matter what, and he was going to get paid for it, and everybody who is identified on page 18 [of the government's sentencing memorandum], all of these Braniff employees understood that and understood that that was going to be allowed to happen, and so for the protection of their own jobs they went along with all of this.

. . . Mr. Spencer had to find some way to get money to himself that didn't get revealed to various persons, including the bankruptcy creditors, and so all of these people had to basically go along with the larger scheme. . . .

. . . .

[I]n order to get himself paid, he didn't just have to do one thing or implicate one person, he had to involve the whole company in this fraud that he was involved in.

The district court explicitly endorsed the government's sentencing memorandum listing the number of persons required for the success of the scheme; finding that Spencer, his father, Pliss, and Chodorow were knowing, criminally responsible participants in the

scheme; and finding that a large number of Braniff employees were also essential to the scheme. These employees included Braniff's Vice President of Finance and others in Braniff's accounting department who followed Spencer's instructions to pay Pliss, the advertising personnel who prepared advertising for Pliss, and other employees who facilitated Spencer's ability to exercise control over the airline and its advertising budget. The district court's endorsement of the government's list of persons necessary to carry out the scheme satisfies the requirements of *Carrozzella.* Unlike the district court in *Carrozzella,* Judge Raggi did not rely upon an impermissible factor such as the number of creditors defrauded; nor did she take into account persons whose role was obscure. Thus, the district court properly applied the base offense enhancement under § 3B1.1(a) for Spencer's role as "otherwise extensive."

### C. *Amount of Loss and More Than Minimal Planning*

 The remaining challenges raised by Spencer to his sentence are also without merit. Spencer contends that the district court erred in increasing his base offense level by nine levels pursuant to § 2F1.1(b)(1)(J) for causing a loss of more than $350,000. He argues that only the money traced to overpayments from Braniff to Pliss, and subsequently transmitted from Pliss to Spencer, are properly included in the loss calculation. He claims that the 11% commission payments from Pliss were not Braniff's property and should be excluded from the loss calculation. As we have discussed, the jury resolved the dispute over the ownership of those funds in the government's favor; therefore, the district court did not err in including all of the payments received by Spencer in the loss amount.

 Spencer also claims that the loss amount should be reduced by the value of his services to Braniff. The Third Circuit has held that in calculating the loss amount under the Guidelines, a court should not include fees paid to a person engaging in the unauthorized practice of law to the extent that the service provided was satisfactory. *See United States v. Maurello,* 76 F.3d 1304, 1312–13

(3d Cir.1996). Even if we were to endorse the approach of the Third Circuit, it would not apply here because the district court made a factual finding that Spencer did not provide valuable services to Braniff and this finding was not clearly erroneous. The district court expressly found that Spencer "was incompetent and I don't understand how anyone could have entrusted him with the operation of this airline." In calculating the loss amount, the district court indicated that the $350,000 loss attributed to Spencer was "conservative" and that his actions possibly caused a much larger loss. We find no error in the district court's determination that Spencer caused a loss of $350,000 to the Braniff estate.

 Finally, Spencer's challenge to the district court's increase of his offense level pursuant to § 2F1.1(b)(2)(A) because his offense involved "more than minimal planning" is frivolous. Spencer's creation and implementation of the scheme to launder payments easily fits within this guideline. *See* U.S.S.G. § 1B1.1, Application Note 1(f); *United States v. Cropper,* 42 F.3d 755, 757–59 (2d Cir.1994); *United States v. Brach,* 942 F.2d 141, 145 (2d Cir.1991).

### CONCLUSION

The judgment of conviction and sentence is affirmed.