In the
United States Court of Appeals
For the Seventh Circuit

No. 01-2213

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

THEODORE MANTAS and HELMOS
FOOD PRODUCT, INCORPORATED,

Defendants-Appellants.

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 214--James F. Holderman, Judge.

Argued September 28, 2001--Decided December 11, 2001

  Before FLAUM, Chief Judge, and BAUER and
EVANS, Circuit Judges.

  EVANS, Circuit Judge.  According to a
2001 Gallup poll, only 6 percent of
American adults are vegetarians. We think
that percentage would jump dramatically
if the other 94 percent read the record
in this case. This panel has read the
record and will be recommending that more
broccoli, rutabagas, asparagus,
cauliflower, kohlrabi, and tofu burgers
be served at future court dinners.

  In July of 1998, Paul Wolseley, a
compliance officer with the United States
Department of Agriculture, conducted a
random inspection at a Helmos Food
Product warehouse in the South Water
Market District of Chicago. Helmos Food
was a meat and poultry broker owned by
Theodore Mantas. What Wolseley discovered
was deplorable. He noted that the meat
cooler on the warehouse's first floor was
not very cool. In fact, it was warm:
puddles of water were on its floor and
condensation was dripping from its
ceiling and pipes. Black mold was also
growing on the ceiling. Wolseley said he
saw "hot dogs"/1 stored in the cooler
that were not fully sealed--their
packaging was swollen with a milky white
substance, indicating microbiological
growth. When Wolseley asked Mantas if he

would destroy the hot dogs, Mantas refused.

As he continued his inspection, Wolseley noted rodent fecal pellets on pallets and boxes that contained meat products. He also saw several turkeys in the same bloated condition as the hot dogs. His most disturbing discovery, however, was of two skids containing unpackaged meat products covered with rodent excrement and gnaw marks. After this discovery, Wolseley left the warehouse to get his camera. When he returned 10 minutes later, Helmos employees were throwing the defiled meat into a dumpster. Wolseley asked them to stop so that he could take pictures. Mantas then approached Wolseley and demanded that he leave.

Wolseley returned the next morning with Illinois Department of Agriculture compliance officer Harris Sachs. Accompanied by Mantas, Wolseley returned to the area where he had seen the meat covered with rodent feces. It was gone. When Wolseley asked Mantas where the meat products went, he replied, "What products?"

During the second inspection, still more meat covered with rodent excrement and other unsanitary conditions were discovered. Sachs also learned that Helmos' state license to sell meat and poultry had lapsed. After completing their inspection of the first floor, the inspectors told Mantas that the State of Illinois was seizing all of the meat and poultry in the cooler. In so doing, Sachs placed a "red tag" on the cooler, indicating an official seizure.

After tagging the cooler, the inspectors asked Mantas if he was storing any other meat products in the warehouse. Mantas said no. While inspecting the second floor of the warehouse, however, the officials discovered a locked freezer. After it was unlocked, the inspectors discovered more meat and poultry products, many of which were covered with heavy ice, mold, and rodent gnaw marks. The inspectors also noted more than two dozen mice running around on the second and third floors.

While the inspectors were still in the warehouse, the owner of the Bloomingdale Market arrived to place an order. Mantas

agreed to the sale, completed an invoice, and the Bloomingdale customer left with meat, poultry, and cheese from the first floor cooler. Upon seeing this, Wolseley reminded Mantas that he could not sell the products because of their condition. After learning of the sale, Sachs alsoreminded Mantas that the sale violated the seizure order. Nonetheless, an hour later, with inspectors still in the warehouse, Mantas attempted to fill a sales order from M&G Meats. Observing the attempted sale, Sachs again reminded Mantas that the sale would violate state law. After hearing this discussion, the M&G Meats employee backed out of the sale and left the building.

Finally, Mantas decided to close the warehouse to customers later that morning. Officers then began a 2-week inspection. The search revealed severe rodent infestation, which posed a serious health hazard to consumers. Inspectors discovered more living and dead rodents, as well as their fecal pellets, nesting materials, and meat and poultry products that they had gnawed./2

All of this led to federal charges against Mantas and his company for improperly storing adulterated poultry and meat products held for sale in violation of 21 U.S.C. sec.sec. 458(a)(3), 461(a), 610(d), and 676(a). The charges were contested before a jury that found both Mantas and Helmos guilty as charged. They now appeal, raising only issues regarding their sentences, which for Mantas was 24 months in prison and a $50,000 fine and for Helmos a fine of $250,000.
The defendants argue that the district court improperly applied the federal sentencing guideline for fraud rather than the general guideline covering food violations. The district court's choice of which guideline to apply is a question of law, which we review de novo. See United States v. Andersen, 45 F.3d 217, 218 (7th Cir. 1995). Federal sentencing guideline sec.2N2.1 applies to violations of statutes and regulations dealing with food or agricultural products. See U.S.S.G. sec.2N2.1. A district court may use sec.2F1.1, however, when the offense involves fraud or deceit. See U.S.S.G. sec.2F1.1.

The government argues that the

defendants waived the argument about which sentencing guideline should apply because they agreed to the use of the fraud guideline. We may not review waived issues because, technically, there is no error to correct. See United States v. Cooper, 243 F.3d 411, 415 (7th Cir. 2001) (citing Fed. R. Crim. P. 52(b)); United States v. Walton, 255 F.3d 437, 441 (7th Cir. 2001). A waiver is an intentional relinquishment or abandonment of a known right. See Cooper, 243 F.3d at 415-16. Forfeiture, on the other hand, is the failure to make a timely assertion of a right. See id. at 415. We review forfeitures for plain error. See Walton, 255 F.3d at 441.

Here, defense counsel argued at the sentencing hearing that, although sec.2F1.1 applied, sec.2N2.1 was a more appropriate guideline because it specifically addresses food offenses. In making this argument, defense counsel expressly stated that he agreed that sec.2F1.1 applied. Additionally, defense counsel expressly agreed with the district court's use of U.S.S.G. sec.2X1.1, the guideline covering attempt. The court proposed using the attempt guideline because Mantas completed neither his fraudulent sale of adulterated meat to M&G Meats on the day of the seizure nor a later attempt to sell adulterated products to another company, Cermak Produce.

We are reluctant to review issues if it appears that a defendant waived them as a matter of strategy. See Richardson, 238 F.3d at 841. Here, the record indicates that defense counsel agreed as a strategic matter to the district court's use of the attempt guideline. By doing so, the defendants received a 3-level reduction in the base offense level for fraud. See U.S.S.G. sec.2X1.1(b)(1). The district judge and defense counsel explicitly discussed this outcome in considering whether sec.2X1.1 should apply. Therefore, because the defendants affirmatively agreed to the court's use of sec.sec.2F1.1 and 2X1.1, they waived their right to now complain about the choice on appeal.

The defendants also argue that the district court erred in calculating the loss amount for sentencing purposes. Loss is the value of money, services, or property unlawfully taken. See U.S.S.G.

sec.2F1.1, cmt. n.8. The guideline's commentary states that if, for example, the fraud consisted of selling or attempting to sell $40,000 in worthless securities, the loss would be $40,000. See id. Because it found that the defendants would have attempted to sell everything in the warehouse if inspectors had not intervened, the district court based its loss calculation on what the value of the entire inventory of meat and poultry in the warehouse would have been had it been in suitable condition. That computation totaled $258,310. The defendants argue that the court should have considered only the goods that Mantas actually sold or attempted to sell on the day of the seizure, which totaled less than $2,000.

A district court's calculation of the loss amount under the guidelines is a question of fact, which we review for clear error. See United States v. Freitag, 230 F.3d 1019, 1025 (7th Cir. 2000); United States v. Hassan, 211 F.3d 380, 383 (7th Cir. 2000). A defendant appealing a loss calculation carries the heavy burden of showing that the calculation was not only inaccurate, but also outside the realm of permissible computation. See Hassan, 211 F.3d at 383.

Here, Mantas argues that the district court improperly speculated that he intended to sell all of the meat and poultry in the warehouse. See United States v. Vitek Supply Corp., 144 F.3d 476, 492 (7th Cir. 1998) (holding that district court improperly included speculative losses in its calculation). He claims that there is no clear evidence that he intended to sell any goods other than those that he sold to Bloomingdale Market and attempted to sell to M&G Meats and Cermak Produce. Incredibly, Mantasargues that the warehouse's disgusting conditions support this argument. He points out that a lot of meat in thewarehouse had passed its expiration date, in some cases by several years, and that many products were in such deteriorated condition that they were "obviously" unfit for human consumption. Such evidence, he argues, shows that these products "were clearly not intended for sale." Mantas also argues that he was holding some of the spoiled products for return to suppliers and that he intended to destroy others.

Given the evidence, the district court did not clearly err in finding that Mantas intended to sell all of the produce in the warehouse. Underlining this point were Mantas' brazen attempts to sell adulterated meat after inspectors had red-tagged the cooler and were still inspecting the warehouse. Although he claimed that he intended to destroy or return the spoiled products in the upstairs freezer, this claim is belied by several facts. First, Mantas lied to inspectors about the existence of the upstairs freezer and the products it contained, which implies that he was trying to hide something. Second, Mantas moved the frozen products from Helmos' old warehouse to its new one rather than simply destroying them or returning them to suppliers. Third, some of the products contained fraudulently marked expiration dates, suggesting that Mantas still intended to sell them. In light of this substantial evidence, the district judge did not err in basing his loss calculation on the entire amount of food stored in the warehouse.

The defendants also take issue with the district court's enhancement of their sentences by 2 levels for violation of official process. They argue that the Illinois Department of Agriculture's "red tag" was not sufficient to trigger enhancement because it was not the result of judicial or quasi-judicial process. We review de novo the district court's imposition of a 2-offense-level sentence enhancement for violation of official process under U.S.S.G. sec.2F1.1(b)(4)(C)./3 See United States v. Michalek, 54 F.3d 325, 331 (7th Cir. 1995).

Few cases have addressed this enhancement outside of the context of bankruptcy fraud. The two circuits that have addressed it in other contexts are somewhat split over what constitutes official process. The Ninth Circuit held that a letter merely informing the defendant that she might be violating the law was not sufficient to trigger the sentence enhancement. See United States v. Linville, 10 F.3d 630, 631 (9th Cir. 1993). Linville expressed its holding in somewhat broad terms, stating, "We hold that process must be construed to be a directive based upon the kind of formali

ties that undergird orders, injunctions, and decrees. We also hold that the letters and notice and warning of violation in this case are not that. They do little more than convey information about the law and an alleged violation." Id. at 633.

On the other hand, the Second Circuit held that informal administrative process resulting in an informal decree is enough to trigger the enhancement. See United States v. Spencer, 129 F.3d 246, 252 (2d Cir. 1997). Spencer distinguished Linville, finding that the Linville defendant's disregard of an informal warning letter did not demonstrate the sort of aggravated criminal intent intended to trigger the enhancement. See Spencer, 129 F.3d at 252. See also U.S.S.G. sec.2F1.1, cmt. n.6 (stating "A defendant who does not comply with such a prior, official judicial or administrative warning demonstrates aggravated criminal intent and deserves additional punishment."). In Spencer, the defendant had engaged in extensive negotiation with the United States Department of Transportation, culminating in an agreement that he later violated. See Spencer, 129 F.3d at 252. Therefore, the court upheld application of the sentence enhancement because the negotiations constituted informal process sufficient to notify the defendant that he would be punished for violating the agreement. See id.

We have not had occasion to weigh in directly on this issue. In United States v. Gist, 79 F.3d 52, 56 (7th Cir. 1996), we noted only that the injunction at issue fit squarely within Linville's suggested guidelines. We had no occasion to discuss what other sorts of process could trigger the sentencing enhancement.

We think the Second Circuit's more liberal approach to triggering the enhancement beats the more constricted view of the Ninth Circuit. Here, like the defendant in Spencer, Mantas received informal process through the USDA and IDA inspections. The IDA's red tag was an informal decree notifying Mantas that selling the tagged goods would violate state law. See 410 Ill. Comp. Stat. 620/6. Thus, substantial evidence of Mantas' aggravated criminal intent existed to support the district court's

use of the sentencing enhancement.

   The judgment of the district court is
AFFIRMED.

FOOTNOTES

/1 Wolseley said he saw "hot dogs." We think of a
hot dog, however, as an oblong sandwich consist-
ing of a meat product--usually called a frank-
furter or wiener--encased in a split bun. We
assume no buns were in the cooler and that
Wolseley was only referring to the meat product
when he talked about "hot dogs."

/2 Wolseley also testified that he did not observe
any rodent urine during the inspection because it
is not visible to the naked eye. He noted,
though, that he would suspect that rodent urine
was present throughout the warehouse because mice
do not have bladders and therefore urinate con-
stantly, leaving traces of urine everywhere they
roam. We note, however, that Wolseley was not
proffered as an expert witness in mouse anatomy
or mouse urology. Additionally, an Internet
search reveals several scholarlyarticles dealing
with scientific experiments on the urinary blad-
ders of mice, indicating that mice do indeed have
urinary bladders. Therefore, Wolseley's testimony
on this matter may have been incorrect. But in
his defense, we note that Wolseley's precise
testimony was that "Mice don't have bladders like
we do" (emphasis added), whatever that means.

/3 This provision was previously U.S.S.G.
sec.2F1.1(b)(3)(B). Many of the cases cited here,
including United States v. Linville, 10 F.3d 630
(9th Cir. 1993), and United States v. Spencer,
129 F.3d 246 (2d Cir. 1997), refer to this
previous citation.