# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-3548 & 02-3549

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

v.

KEVIN P. SENSMEIER and NEIL E. SENSMEIER,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Southern District of Indiana, Evansville Division.
No. 01 CR 22—**Richard L. Young**, *Judge.*

———————

ARGUED OCTOBER 20, 2003—DECIDED MARCH 22, 2004

———————

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges.*

KANNE, *Circuit Judge.*

## I. History

Jasper Engine Exchange, Inc., located in Jasper, Indiana, specializes in the remanufacturing and resale of various automotive parts, including drive-train components,

engines, transmissions, and differentials.[1] One of the two defendants, Kevin Sensmeier, began working for Jasper as a customer-service representative in the warranty department in November of 1996. Defendant Neil Sensmeier worked in the quality control analysis department from February of 1998 until June of 1999, when he transferred into the warranty department and worked, along with his brother Kevin, as a customer-service representative. Both defendants were supervised by Randall Bauer and were terminated in February of 2000, after the discovery of the fraudulent scheme described below.

Early during his term of employment, Kevin Sensmeier began to sell "cores," which include defective transmissions, engines, and differentials, to Jasper. These sales were wholly independent of his duties and salary as a customer-service representative. Jasper paid Kevin for these cores, which could be refurbished and then resold by the company for a profit. At some point, a disagreement arose between Alan Hinky, Jasper's core purchaser, and Kevin. As a result, Jasper refused to purchase any additional cores from Kevin. In 1998, perhaps partly due to this falling out, but

---

[1] The record for each defendant is distinct and separate. However, the facts of the conspiracy are, in general, mutually applicable. Hence, in laying out the relevant facts in this appeal, we need not differentiate between the two records. Where a citation is used to emphasize support for factual findings, items from Kevin Sensmeier's record on appeal will be noted as ("KR"), while items from Neil Sensmeier's record will be noted as ("NR").

Furthermore, to the extent that the defendants implicitly dispute the facts determined by the district court—a surprising implication given that the defendants both pled guilty and that the district court based much of its factual findings at sentencing upon the defendants' own statements—we find that the district court's factual determinations, which we summarize herein, had ample support in the record and are therefore not clear error.

admittedly due to greed, (KR. 31 at 48-49, 56-57; NR. 28 at 47), the defendants developed a complex scheme of fraud, whereby they, along with the unwitting or knowing assistance of at least four other persons, were able to steal approximately $80,000 from their employer.

Between 1998 and 2000, Jasper customers with malfunctioning products contacted field representatives or directly phoned customer-service representatives, like Kevin or Neil, in the warranty department. Once the customer was in contact with a customer-service representative, the representative would then diagnose the problem, recommend that the part be repaired or replaced, and advise the customer about how to execute the repair, when appropriate. In either case, Jasper would refund the cost of the part and, if defective, the customer was also instructed to return the part. Last, the customer-service representative assigned a case number to the complaint. These claims, whether resulting in the return of a part or a repair, were documented and "processed" by a customer-service representative, including the entry of the claim into a computer database. Once processed, a check was then issued to the complaining customer. All such claims included the initials of the processing customer-service representative. (KR. 13 at 19; NR. 28 at 23-26.)

Beginning on or about June 19, 1998 and continuing through February of 2000, the defendants falsified customer complaints using third-party names, causing refund checks to be issued to these third parties. (KR. 13 at 21-33; NR. 13 at 21-33.) Although it is undisputed that many of the fraudulent claims submitted by the defendants were never tied to any actual Jasper parts, (KR. 13 at 39-40; NR. 13 at 39-40), the defendants claim that in some instances they did purchase defective Jasper parts still under warranty, and sent those real parts in to Jasper under a third-party name. However, the record contains no evidence whatsoever of any such parts. And even if such parts were sent in to

support the warranty claim, defendants admit that the claim itself was nonetheless fraudulent as there never were any actual customers who called in with any true complaints about any Jasper parts. (NR. 28 at 31-33.)

As aforementioned, the defendants used fictional and real third-party names as the complaining consumers to conceal their fraud, none of whom ever had legitimate warranty claims with Jasper Engine. To receive the refund checks, the defendants caused fifty-six post-office boxes to be opened. And to further obfuscate their fraud, the post- office boxes were opened in a six-state area, including Indiana, Illinois, Kentucky, Ohio, Tennessee, and Missouri. Either Kevin or Neil personally negotiated the refund checks, or instructed third parties to negotiate the checks on their behalf and turn the proceeds over. The brothers also opened several checking accounts to deposit the proceeds of the fraud.

Both brothers were actively involved in the fraudulent scheme from the beginning. While true that only Kevin physically created the paperwork to support the false warranty claims, (NR. 13 at 31), Kevin also stated, "Neil and I came up with [the] idea on how to work around the warranty system and receive money." (KR. 31 at 47.) Neil personally opened at least six post-office boxes, including the very first box opened to facilitate the fraud, on June 19, 1998. Kevin opened at least seven post-office boxes, the first of which on June 27, 1998. Each post-office box included the name of at least one person other than the defendants as an authorized recipient of mail at the box.

Both brothers enjoyed the profits of the fraud. Neil personally negotiated at least one check (KR. 31 at 29-30; NR. 13 at 32, 45), directed his girlfriend, Jill Heck, and his roommate, Michael Knapp, to negotiate at least two checks, each on his behalf, and to turn the proceeds over to him and/or his brother. (KR. 31 at 29-30; NR. 13 at 32-33.)

These three checks totalled approximately $2000. Neil admitted he was aware that this $2000 he directly received as a result of this scheme was obtained fraudulently. (NR. 13 at 45-46.) Kevin negotiated numerous checks, recruited his girlfriend Rebecca Goldmann and others to participate in the fraud, and generally oversaw the operation. (KR. 13 at 16-20; KR. 31 at 32-33, 37.) Furthermore, the defendants "split" or shared the funds received from Jasper based upon "how much work each of us had done on it," regardless of who specifically negotiated the check. (KR. 31 at 47; NR. 28 at 13, 17.) Lastly, Neil's initials, "N.S.", appeared on a number of the fraudulent claims, indicating that he was the customer-service representative who processed those claims.

In total, the defendants caused Jasper to issue 178 warranty checks in the amount of $100,254.88. (KR. 31 at 9; NR. 28 at 8-9.) The defendants successfully negotiated 157 checks in the amount of $88,456.74. (KR. 13 at 32; KR. 31 at 9-10; NR. 13 at 32.) Approximately $3,760.00 was recovered by the Indiana State Police, thus reducing the total amount obtained by the defendants to $84,696.74. (KR. 31 at 15; NR. 28 at 9.)

On January 28, 2002, both defendants pled guilty to a conspiracy, 18 U.S.C. § 371 (2001), to commit mail fraud, 18 U.S.C. § 1341 (2001). Following the preparation of pre-sentence investigation reports ("PSR"), the district court judge sentenced the defendants on September 4, 2002. The base level for the offense was six, U.S.S.G. §§ 2B1.1(a), 2X1.1 (2001). Eight levels were added under U.S.S.G. § 2B1.1(b)(1)(E) because the intended loss was between $70,000 and $120,000. Kevin was given an additional four-level enhancement under U.S.S.G. § 3B1.1 for his role as an organizer or leader in the conspiracy. Kevin and Neil were both granted a two-level downward adjustment for acceptance of responsibility under U.S.S.G. § 3E1.1(a). And Kevin was given an additional one-level downward adjustment

also for acceptance of responsibility under U.S.S.G. § 3E1.1.(b). No other adjustments were made, and the judge noted that neither defendant had any other criminal history.

The total offense level for Kevin was fifteen, with a corresponding U.S.S.G. suggested range of incarceration between eighteen and twenty-four months. The total offense level for Neil was twelve, with a U.S.S.G. range between ten and sixteen months. And for both defendants the statutory maximum period of imprisonment was five years with a U.S.S.G. range for supervised release of two- to-three years. Restitution was required under U.S.S.G. § 5E1.1. The district court judge sentenced Kevin to twenty-three months' imprisonment; sentenced Neil to six months' imprisonment (four months less than the lowest end of recommended U.S.S.G. suggested range), followed by six months' home detention; and ordered restitution in the amount of $84,696.74, owed by the defendants jointly and severally.

The Sensmeiers now challenge the district court's offense-level calculation and the restitution ordered under 18 U.S.C. § 3663A. For the reasons set forth below, we affirm the Sensmeiers' sentences and restitution orders.

## II. Analysis

The defendants' basic argument is that the district court failed to offset the amount of loss to Jasper by the value the defendants claim the victim gained through the resale of defective parts which the defendants allegedly sent to Jasper to facilitate their fraud. They assert that had the court offset the amount of Jasper's loss by its alleged "gain," then the eight-level enhancement under U.S.S.G. § 2B1.1 would have been inappropriate and the amount of restitution ordered would have been less. Neil also objects to the joint and several nature of the restitution order and

correspondingly, to the district court's failure to apportion the restitution order to more closely comport with Neil's perception of his own culpability. We find these arguments unpersuasive.

### A. Calculation of loss

Defendants challenge the district court's determination of the amount of loss caused by their crime under § 2B1.1(b)(1) of the Sentencing Guidelines. Section 2B1.1(b)(1) applies to crimes of fraud and deceit. If the crime caused victims loss over $5000, the sentence is enhanced according to the amount of loss caused. The district court found that the defendants had intended to cause loss totaling approximately $100,254.88, resulting in an eight-level enhancement for each defendant. Both Neil and Kevin now assert that the court's calculation of loss relied upon an incorrect definition of loss, which did not account for the value of parts allegedly received by Jasper. The definition of the term "loss" under the Guidelines is a question of law reviewed de novo, while the calculation of loss is a finding of fact, which we review for clear error. *United States v. Vivit*, 214 F.3d 908, 914 (7th Cir. 2000); *United States v. Jackson*, 95 F.3d 500, 505 (7th Cir. 1996). Had the value of parts received by Jasper been correctly considered, the defendants allege, then the net loss to the victim would have been less than $70,000.[2] This argument fails for two primary reasons.

First, both Kevin and Neil waived this issue. Waiver is the "intentional relinquishment or abandonment of a known right," *United States v. Woods*, 301 F.3d 556, 560 (7th Cir. 2002) (citations omitted), representing "the manifestation

---

[2]  Under U.S.S.G. § 2B1.1(b)(1) loss greater than $70,000 but less than $120,000 results in an eight-level enhancement, while loss between $30,000 and $70,000 results in a six-level enhancement.

of an intentional choice," *United States v. Johnson*, 289 F.3d 1034, 1041 (7th Cir. 2002). Here, both Kevin and Neil, through counsel, objected to the calculation of the intended loss, and then explicitly withdrew those objections to the extent that they were based upon the argument the defendants now advance—intended loss, as calculated by the district court, should be reduced by any value gained by Jasper. The following exchange occurred between Kevin's counsel and the court during his sentencing hearing:

THE COURT:      The next objection . . . is objection to [ ] the amount of intended loss.

MR. KEATING (Kevin Sensmeier's counsel):

Your Honor, we intend to, I think, address that, both parties as it concerns restitution. It will not make any difference in the guideline determination because even our best case will not show intended loss below the next level to drop that particular point total down, so we could reserve that argument until—

THE COURT:      So this objection basically goes to restitution amount, not intended loss?

MR. KEATING:    More so than intended loss. Even if I could convince you of our position on that, it wouldn't make any difference.

THE COURT:      Okay. All right. So would you say you're withdrawing that?

MR. KEATING:    I will withdraw that objection as it concerns the intended loss.

(KR. 31 at 14-15.) This constitutes clear waiver and hence, there is no error for us to review now on appeal.

Neil's counsel also objected to the intended loss calculation at Neil's sentencing hearing, but then stated, "The intended loss, and I think that was—was that reduced in

Kevin's case to 86? I guess it makes no difference if it's between 70 and 120, the amount of loss is the same, except for I think it's limited by his relevant conduct, what he knew, what he participated in, which I think is the real question." (NR. 28 at 12-13.) Neil's counsel went on to argue *not* that Neil's enhancement under Section 2B1.1(b)(1) should only be six levels because the amount of intended loss was $70,000 or less due to the value gained by Jasper offsetting a part of its loss, the issue Neil raises before this court, *but rather* that Neil's enhancement should be less than eight levels since he directly received only $2000—an issue not raised by Neil on appeal.[3] (NR. 28 at 13-18.) Furthermore, Neil's counsel later stated that the value of parts obtained by Jasper from the defendants is a "factor that plays into—not the intended loss, but [ ] restitution." (NR. 28 at 34.) The objection, considered along with these statements, constitutes waiver. Since both Kevin and Neil explicitly withdrew any objection to the court's calculation of intended loss based upon a failure to offset such loss with alleged value gained by Jasper, there is no error for us to review now. *See, e.g., United States v. Olano*, 507 U.S. 725, 732-34 (1993); *Johnson*, 289 F.3d at 1040-41; *United States v. Mantas*, 274 F.3d 1127, 1130-31 (7th Cir. 2001); *United States v. Richardson*, 238 F.3d 837, 841 (7th Cir. 2001).

Second, notwithstanding the Sensmeiers' waivers of this issue, their argument fails on the merits. "Loss" under § 2B1.1(b)(1) cmt. 2(A) is "the greater of actual loss or intended loss." Intended loss is defined as "the pecuniary harm that was intended to result from the offense . . . includ[ing] intended pecuniary harm that would have been impossible or unlikely to occur . . . ." Evidence presented at the sentencing hearings demonstrated that 178 checks were

---

[3] Wisely, Neil's counsel decided not to raise this argument on appeal because it is an incorrect statement of the law, *see* U.S.S.G. § 1B1.3; (NR. 28 at 14-17).

issued by Jasper to third parties, based upon fraudulent claims, for an aggregate amount of $100,254.88. (KR. 13 at 32; KR. 31 at 9-10; NR. 13 at 32; NR. 28 at 15.) Thus, the government had demonstrated by a preponderance of the evidence, *United States v. Ramirez*, 94 F.3d 1095, 1101 (7th Cir. 1996), that an upward sentencing adjustment, based upon an intended loss of $100,254.88, was appropriate.

Assuming, *arguendo*, that (1) intended loss amounts should be reduced by any value received by the victim;[4] and (2) the defendants had put forth some credible evidence with respect to the alleged value gained by Jasper, then the district court should have reduced the $100,254.88 by that amount. But tellingly enough, nowhere in this appellate record, nor in either of the defendant's appellate briefs to this court, can we find any mention of a specific dollar amount of value allegedly received by Jasper in conjunction with the defendants' scheme of fraud. This court had to look to the *government's* brief, (U.S. Br. at 6, 9), to discover the specific amount of value, $17,000, the defendants previously alleged (in their respective PSRs) Jasper received. Subtracting $17,000 from $100,254.88 leaves us well above the $70,000 mark. Therefore, the district court's eight-level enhancement under U.S.S.G. § 2B1.1(b)(1)(E) is easily affirmed.

## B.  The restitution order

The defendants challenge the restitution order entered under 18 U.S.C. § 3663A (2001), known as the Mandatory Victim Restitution Act ("MVRA"), and 18 U.S.C. § 3664 (2001). Because the defendants pled guilty to a conspiracy to commit mail fraud and the victim suffered a pecuniary

---

[4]  We need not, and explicitly decline to, accept or reject this legal proposition.

loss, the MVRA applies. § 3663A(c)(1)(B). Thus, a court must order that the defendants pay restitution to the victim in an amount equal to:

(i)  the greater of  (I)  the value of the property on the date of the damage, loss, or destruction; or

(II) the value of the property on the date of sentencing, less

(ii) the value (as of the date the property is returned) of any part of the property that is returned.

18 U.S.C. § 3663A(b)(1)(B). The court ordered restitution in the amount of $84,696.74, owed jointly and severally by both defendants.

### 1. The amount of restitution

The Sensmeiers now request that this court order a new hearing regarding restitution in which the amount of Jasper's loss would be reevaluated and reduced by the value of the items Jasper received in the fraudulent transactions. We review the district court's calculation of the amount of restitution for an abuse of discretion. *United States v. Newman*, 144 F.3d 531, 542 (7th Cir. 1998). A restitution order will be disturbed only if the district court relied upon inappropriate factors when it exercised its discretion or failed to use any discretion at all. *United States v. Chay*, 281 F.3d 682, 686 (7th Cir. 2002). The economic circumstances of a defendant *cannot* be considered by the court when fixing the amount of the restitution.[5] 18 U.S.C. § 3664(f)(1)(A); *see United States v. Szarwark*, 168 F.3d 993,

---

[5] The economic circumstances of a defendant may only be considered regarding the manner and schedule for payment of the restitution amount. 18 U.S.C. § 3664(f)(2).

997 (7th Cir. 1999); *Newman*, 144 F.3d at 537 n.5. And the government bears the burden of demonstrating the amount of the loss, with any dispute as to the amount resolved by a preponderance of the evidence. 18 U.S.C. § 3664(e); *United States v. McIntosh*, 198 F.3d 995, 1003 (7th Cir. 2000). Kevin clearly waived this issue at sentencing. And while Neil did not waive the issue, the district court did not abuse its discretion.

A bit of background is necessary regarding the various loss amounts discussed during the brothers' sentencing. According to the PSR, the defendants successfully negotiated 157 checks in the amount of $88,456.74 as a result of the fraud. (KR. 13 at 32; KR. 31 at 9-10; NR. 13 at 32.) But at the sentencing hearing, the Sensmeiers objected to this determination and Kevin produced evidence that approximately $3,760.00 was recovered by state police. Thus, the court held and the prosecution—to defense counsels' surprise—agreed that the total amount obtained by the defendants was $84,696.74. (KR. 31 at 14-15, 61; NR. 28 at 9.)

In addition, in response to the defendants' argument that the loss to Jasper, and hence any restitution, should be reduced by the value obtained as a result of the fraudulent transactions, (KR. 31 at 15, 61-62; NR. 28 at 34-35), the prosecution prepared to put on evidence of additional checks negotiated for a total of approximately $5000—$6000 over and above the $84,696.74, (KR. 31 at 28, 54, 61; NR. 28 at 35), but discovered *after* the preparation of the PSR. Apparently, the government's intent was to present such evidence only if defendants persisted in objecting to the $84,696.74 restitution amount based upon their argument that the loss should be reduced by some alleged value gained by Jasper.

During Kevin's sentencing hearing, he objected to the amount of loss when first discussed with respect to en-

hancements under the U.S.S.G. His objection was waived and reserved only as it pertained to restitution. (KR. 31 at 14-15.) This issue was broached again later in the hearing, after the judge ordered $84,696.74 in restitution:

THE COURT:     Do you have any questions, sir, about anything?

MR. KEATING:   Your Honor, regarding restitution, we initially, I think, contemplated the presentation of evidence because there was dispute with the government over that, but if Mr. Warden [the prosecution] tells me they are—you are acquiescing on the $84,000 net figure—

MR. WARDEN (counsel for the government):

               The reason I am, the other information the government had was obtained after it had been provided to Mr. DeCarli [the probation officer preparing the PSR].

THE COURT:     How much difference is there?

MR. WARDEN:    It's about a $6000 difference, Your Honor. So Mr. Keating, I didn't see him object to the number that is now before the Court [$84,696.74]. If there is no objection to that, we're not going to pursue the different figure.

MR. KEATING:   I'd like a minute to talk to my client. I think we will also at this point call it even, but I need to talk to him. I wasn't aware that this was going to happen as far as their agreeing to the lower amount.

THE COURT:     Okay.

MR. KEATING:   Other than that, I have no other comment.

THE COURT:      Okay. Anything further?

MR. KEATING:   No sir. . . .

(KR. 31 at 61-62.) This is an acceptance of the $84,696.74 restitution figure and thus, clearly constitutes waiver. *See*, *e.g.*, *Johnson*, 289 F.3d at 1040-41; *Richardson*, 238 F.3d at 841; *Mantas*, 274 F.3d at 1130-31; *Olano*, 507 U.S. at 732-34.

In contrast, Neil objected to the restitution amount and then failed to expressly renew his objection following the prosecutor's suggestion that he would prove loss equal to $93,000 and the court's implicit rejection of the argument Neil proffers here. (NR. 28 at 34-36, 48-51.) This does not amount to an "intentional relinquishment or abandonment of a known right," representing the manifestation of an intentional choice. *Woods*, 301 F.3d at 560.

Regardless, the government met its burden of demonstrating loss equal to $84,696.74. (KR. 13 at 32; KR. 31 at 9-10, 14-15, 61; NR. 13 at 32; NR. 28 at 9.) The Sensmeiers had an opportunity, *at their sentencing hearing*, to present evidence of the alleged value of cores they claim Jasper received as a result of the fraudulent scheme. After a thorough review of the record and as alluded to in the previous section, this court is certain that the Sensmeiers presented no such evidence. The defendants merely stated that they believed Jasper received some value in the form of some unknown number of actual cores allegedly returned to Jasper as part of the fraud. And while we acknowledge that the burden is on the government to prove loss, the defendants' wholly unsubstantiated statements are not enough to undermine, nor even question, the court's acceptance of the government's proof of loss. *See Newman*, 144 F.3d at 543; *United States v. Purchess*, 107 F.3d 1261, 1268 (7th Cir. 1997). Generously assuming that the defendants did in fact raise a factual dispute as to the amount of

loss, the preponderance—indeed *all*—of the evidence in the record supports the court's finding that the loss to Jasper equaled $84,696.74, and hence, the court did not abuse its discretion.

### 2.  The joint and several nature of the restitution order

Finally, Neil requests that this court order a new restitution hearing and direct the district court to reapportion the restitution award to comport with Neil's perception of his relative contribution to the loss, general culpability, and economic circumstances. When there is more than one defendant that has contributed to the loss of a victim, district courts enjoy the option of either imposing full liability on each defendant or apportioning the liability among the defendants to reflect the culpability and economic circumstances of each. 18 U.S.C. § 3664(h); *United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002) ("The court had the discretion to apportion the [restitution] total, but was not required to do so."). We review a court's exercise of such discretion for abuse. *See Chay*, 281 F.3d at 686.

Neil makes the following contentions to support his argument that the district court abused its discretion when it ordered him to pay the full amount of restitution: (1) the district court thought it *must* order Neil pay the full amount of restitution; (2) the district court incorrectly considered the foreseeability of the victim's losses to Neil; (3) it was inconsistent for the court to decline to order interest or a fine based upon the defendant's economic circumstances and yet order the full amount of restitution with payment to begin immediately; and (4) the government demonstrated that the defendant *directly* received only approximately $2000.

There is nothing in the record to support the first contention, and it is summarily dismissed.[6] With respect to the second and fourth contentions, both are thinly veiled challenges to the district court's finding that Neil, while not the organizer or leader of the fraud, was equally culpable for its perpetration. Hence, both are rejected in that the record, as summarized above, amply supports the determinations regarding Neil's relative guilt. In fact, the district court's exercise of its discretion can find enough support in a few sentences of Kevin's testimony:

> Neil and I came up with an idea on how to work around the warranty system and receive money. Neil opened P.O. boxes in Kentucky, and I started to issue warranty claims and cashed the money. Neil and I split the money per claim depending on how much work each of us had done on it. On occasion we had our own individual claim that the other one didn't know about.

(KR. 31 at 47-48.) Neil was involved in this fraud from its inception and may have taken part in its development. He personally opened six post-office boxes, including the very first box opened in order to execute the fraud. He processed some of the fraudulent claims himself. He directly oversaw or personally negotiated at least three checks. He directly received approximately $2000 of the fraudulent proceeds and most likely, indirectly received much more. And most importantly, Neil pled guilty to this offense. He cannot proclaim, for all intents and purposes, his innocence on appeal in an effort to avoid a restitution order based firmly in the record.

---

[6]  In fact, the record reflects that the district court was well aware of its option of apportioning the restitution amount in that it heard extensive arguments about Neil's relative blameworthiness (NR. 28 at 7, 9, 12-18, 40, 48, 52), and apportionment (Neil Sensmeier's App. Br. Appendix at 31).

Lastly, Neil's challenge to the district court's decision to hold him responsible for the *entire* restitution amount with payment to begin *immediately*, while forgoing an order of fees or interest, is rejected. Just as the district court need not apportion the restitution amount, it is under no obligation to set up a payment schedule. 18 U.S.C. § 3664(f)(3)(B). Furthermore, simply because a court opted not to order the payment of interest or fees, does not, in and of itself, establish that the court abused its discretion in ordering full restitution. The record is rife with evidence that Neil should be able to make immediate payments of some amount toward restitution. He is young, in good physical condition, denied any use of illegal drugs, completed high school and has some college credit, has a stable employment history, was gainfully employed as a mechanic at the time the charges were brought, and has a supportive family. (NR. 28 at 5, 6, 37, 53.) Furthermore, Neil was sentenced to only six months' incarceration, after which his employer at the time indicated he could return to work. (NR. 28 at 48-50.) As this court has made clear, "immediate payment" does not mean "immediate payment in full," but rather "payment to the extent that the defendant can make in good faith, beginning immediately." *United States v. Burke*, 125 F.3d 401, 407 (7th Cir. 1997) (quotation omitted). There is a good policy reason behind a district court's ability to order immediate payment: after a defendant is released, if he fails to continue to make payments in good faith, the court may send him back to prison. *See United States v. Trigg*, 119 F.3d 493, 500 (7th Cir. 1997). This provides a powerful incentive for the continued repayment of restitution. In sum, the district court did not abuse its discretion when it ordered that both Kevin and Neil Sensmeier be held jointly and severally responsible for the payment of restitution.

## III.  Conclusion

For the foregoing reasons, we AFFIRM the district court's sentences and restitution orders.

A true Copy:

 Teste:

      _____
      *Clerk of the United States Court of*
      *Appeals for the Seventh Circuit*